# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
February 11, 2015 Session

## STATE OF TENNESSEE v. KURT BREWER

**Appeal from the Circuit Court for Grundy County**
**No. 4957     Thomas W. Graham, Judge**

---

### No. M2014-00601-CCA-R3-CD - Filed April 28, 2015

---

A Grundy County Grand Jury indicted Kurt Brewer, the Defendant, for one count of first degree premeditated murder, two counts of reckless endangerment with a deadly weapon, and one count of employing a firearm during the commission of a dangerous felony. A jury found the Defendant guilty of the lesser-included offense of reckless homicide and not guilty on both counts of reckless endangerment with a deadly weapon. The charge of employing a firearm during the commission of a dangerous felony was not submitted to the jury. The jury set the maximum fine for a class D felony, $5,000. The trial court imposed a four-year sentence to be served. The Defendant claims the trial court erred in not granting an alternative sentence and in denying judicial diversion. After a thorough review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Stephen T. Greer, Dunlap, Tennessee, for the appellant, Kurt Brewer.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; T. Michael Taylor, District Attorney General; and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

*Trial*

The Defendant and Corey Henry, the victim, had been friends since grammar school. The Defendant was also friends with the victim's cousins, Jason and Jazmin Sweeton. On the afternoon of July 29, 2012, the Defendant telephoned Ms. Sweeton in an effort to find Mr. Sweeton. The Defendant had been trying to call Mr. Sweeton and believed Mr. Sweeton was ignoring him. The Defendant was angry over $25 that he claimed the victim owed him, and he told Ms. Sweeton that she needed to get in touch with her brother and the victim or "he would blow bullet holes in whatever they were driving." Ms. Sweeton sent a text to her brother and asked where the victim was.

Mr. Sweeton, Brittany Johnson, and the victim were drinking beer in Mr. Sweeton's parent's yard. Mr. Sweeton said his cell phone was in his car so that the battery could be charged. When he checked his phone, he noticed that he had missed calls from the Defendant and his sister and a text from his sister. Mr. Sweeton telephoned his sister, and she asked where the victim was. Mr. Sweeton handed the phone to the victim. Based on what the victim told him about the conversation with Ms. Sweeton, Mr. Sweeton called the Defendant and asked him what was wrong. The Defendant asked where the victim was. Mr. Sweeton told the Defendant that he and the victim were at Mr. Sweeton's mom's house drinking beer and told him "to come on down." The Defendant said, "[W]ell, I'm about to pull in, and if I don't get my money I'm going to put a bullet in his head." Shortly thereafter, the Defendant arrived at the Sweeton home, exited his vehicle, and immediately confronted the victim demanding his money. The two argued "face to face." The victim shoved the Defendant away, and as the Defendant was backing away, he pulled out a gun and pointed it at the victim. The victim was smiling and said, "Are you going to shoot me? Just go ahead and shoot me[.]" The Defendant cocked the hammer on the revolver and began firing at the victim from about eight to ten feet away. The victim was struck two times in his left leg and fell to the ground. The Defendant walked to where the victim lay and fired another round striking the victim. The Defendant got back into his car and left the scene.

Mr. Sweeton's mother called 911, and the sheriff and an ambulance arrived a few minutes later. Mr. Sweeton testified the victim was unarmed. On cross-examination, Mr. Sweeton admitted that he told the sheriff's investigator that the victim "slapped" the Defendant. He also confirmed he never told the investigator that the Defendant approached the victim and shot him a third time after the victim was initially wounded. Mr. Sweeton also

told the investigator he did not think the Defendant was trying to kill the victim because he was firing at the victim's legs. Mr. Sweeton did not know the victim had been shot in the back until the paramedics arrived and turned him over. Mr. Sweeton explained he was in "shock" at the scene but later that night he had time to reflect on what happened.

Brittany Johnson testified that, when the Defendant arrived at the scene, the Defendant exited his vehicle screaming, "where my F-ing $25." She said the Defendant's girlfriend, Jordan Bradford,[1] remained in the Defendant's car. The Defendant and the victim got face-to-face, and the victim pushed the Defendant back and said, "You really going shoot me over $25?" The Defendant pulled a gun from behind his back and fired four or five times. Ms. Bradford exited the car screaming, "I can't believe you just shot him." They then got in the Defendant's car and left.

Ms. Johnson said the victim did not have any kind of weapon. Ms. Johnson had been dating the victim for five years at the time of the incident. She said the victim sometimes carried her "little 32 derringer" and sometimes carried a "22 pistol." On cross-examination, Ms. Johnson admitted telling the investigator at the scene that the victim "smacked [the Defendant] with his open hand." She also said that the Defendant was about ten feet from the victim when he opened fire.

Sheriff Brent Myers testified that, when he arrived at the scene, EMT Jared Meeks was administering aid to the victim and Deputy Leslie Turner and Sergeant Jason Coffelt had secured the scene. Sergeant Coffelt did not find a weapon at the scene. Sheriff Myers said there was no weapon in the victim's pants. The sheriff went to the residence of Quinton Bradford, the father of the Defendant's then-girlfriend. The Defendant was there and told the sheriff "you want [sic] have any problem out of me" and offered his hands to be cuffed. The sheriff took the Defendant into custody and advised him of his rights. The Defendant said he threw the gun out on Tatesville Road.

Deputy Sheriff Jared Nunley was dispatched to Mr. Bradford's home. When he arrived, the Defendant was seated in the back of Deputy Cody Scissom's patrol car. The Defendant agreed to take Deputy Nunley to the location where he threw the pistol. Deputy Nunley found the pistol still in its pouch near a pond. Deputy Turner arrived at the scene and, after the pistol was found, called for Sheriff's Department Investigator Robin McNeese to come to their location. As Deputy Nunley was walking the Defendant back to the patrol car, the Defendant calmly said, "I'm tired of all the drug addicts and shit and I wish I'd shot him in the fucking face." On cross-examination, Deputy Nunley agreed that his report stated

---

[1]At the time of the trial, Ms. Bradford and the Defendant were married, and her name was Jordan Brewer.

the Defendant said, "He's lucky I didn't shoot him in the face."

Investigator McNeese was initially dispatched to the Sweetons' home but, upon her arrival, was asked to go to Mr. Bradford's home. After arriving at the Bradfords' home, she began photographing the Burgundy PT Cruiser identified as being involved with the shooting. Investigator McNeese was next sent to Tatesville Road where she found the Defendant and several deputies. She photographed Deputy Turner standing over a pouch containing a pistol found near a pond approximately 50 feet off the road. After taking the pistol and pouch into evidence, she secured the pistol and found that it contained three spent casings and two unfired rounds.

Tennessee Bureau of Investigation ("TBI") forensic scientist Kevin Warner examined the cartridge casings and two bullets, one recovered from the victim and the other recovered from the ground near the victim. After performing ballistic tests, Agent Warner determined that the bullet recovered from the victim's body was fired from the Charter Arms undercover model .38 Special caliber revolver identified as being recovered from Tatesville Road ("the .38 Special"). The bullet recovered from the ground was damaged. Agent Warner stated it was consistent with a bullet fired from the .38 Special, but he could not testify conclusively it was fired from the weapon. He determined the cartridge casings were "fired through" the .38 Special.

Dr. Adele Lewis, a forensic pathologist, performed the autopsy on the victim. Dr. Lewis testified that the victim was shot three times. Two bullets entered the victim's left thigh and exited the victim's buttock. Another bullet entered the victim's left lower back and lodged near the right side of the abdomen severing a major vein in the abdomen. Dr. Lewis opined that the bullet that entered the victim's back caused his death.

Jordan (Bradford) Brewer, the Defendant's wife, testified that she was in the car with the Defendant when he called Jazmin Sweeton and she could hear everything that the Defendant said. She said she was positive that the Defendant did not say anything about putting a "bullet hole in the car they were in." She said she also overheard the call from Mr. Sweeton to the Defendant and the Defendant never said he was "going to put a bullet hole in [the victim's] head." After the conversation, they arrived at Mr. Sweeton's parents' home. She said the Defendant usually carried a gun and, when they got to the Sweetons' home, the Defendant got out of the vehicle, reached back in and got his gun, and put it in his belt. She said she could tell the victim was angry and the two started yelling. She saw the Defendant back up towards the car and then pull the gun from his belt and shoot twice low, towards the ground and a third time as the victim turned away. After the third shot, the victim fell to the ground. She estimated the Defendant was 10 to 15 feet away from the victim when he started shooting. She and the Defendant then left. She said the victim did not work and that the

Defendant often loaned him money.

The Defendant testified that he learned to shoot firearms at an early age and had been around guns his entire life. He said he was an excellent shot with the pistol from about "ten yards." His grandfather gave him the .38 Special before he died. He said he carried a pistol everywhere he went, either on his person or in his car. He said he had been friends with the victim since grammar school and, prior to the day of the shooting, they had never had a physical confrontation. He said the victim often borrowed money from him and would only repay it when the Defendant asked him. He said the victim owed him $25 and had told the Defendant the previous Friday that he would pay it back on Sunday. The Defendant had been unable to get in touch with the victim, so he called Jazmin Sweeton to see if the victim was with her. He denied saying he would put a bullet in whatever the victim was driving. Shortly after talking to Ms. Sweeton, the Defendant got a call from Jason Sweeton who told him that he and the victim were at Mr. Sweeton's mom's house and "to come on down." The Defendant said he would stop by and told Mr. Sweeton, "Cory owes me some money and he's suppose to stop by the house and pay me for it today and I was going to ask him about it anyway." He denied threatening to "put a bullet in the [victim's] head." When the Defendant arrived at the Sweetons' home, he put his revolver in a pouch behind his belt out of "habit." He said when he got out of the car, he could only see Mr. Sweeton sitting on the back of the camper. He saw the victim's ".22 pistol" on top of "the dog box." The Defendant claimed that the victim came out from behind the camper and angrily accused the Defendant of threatening to shoot him. The Defendant said, "I don't know what you're talking about." During the argument, the victim "slapped" the Defendant, and the Defendant started to back away. The Defendant claimed the victim said, "if I was going to shoot him, ... [y]ou better get your damn little gun before I get mine". The Defendant said the victim then "runs his hand in his right pocket." The Defendant said the victim was trying to pull a .32 caliber derringer out of his right pocket. The Defendant claimed he reached behind his back, unzipped the pouch, and pulled out his pistol. He said the victim was still trying to get the derringer out of his pocket, so he cocked the hammer on his pistol and fired toward the ground two times. He said the victim took his hand out of his pocket, turned to his right, and reached for the .22 on the dog box. The Defendant fired a third shot, and the victim fell to the ground. The Defendant claimed he was only trying to disable the victim, not kill him.

The jury found the Defendant not guilty of first degree murder, second degree murder, and voluntary manslaughter but returned a guilty verdict for reckless homicide.

*Sentencing Hearing*

A sentencing hearing was held on November 1, 2013. The presentence "Investigation Report" was admitted through Andrew Thornton with the Tennessee Department of

Correction, Probation and Parole Division. The "Investigation Report" stated that the Defendant was 32 years of age at the time of sentencing and his criminal history consisted of two minor traffic offenses: a seat belt violation in 2004 and speeding in 2001. After graduating from high school, he earned an associates degree from Chattanooga State Community College. The Defendant was married and had one daughter. He was a member of the International Brotherhood of Electrical Workers ("IBEW") and was certified as a "journeyman–inside wireman." He worked at Adman Electric Company. He previously worked at Watts Bar Nuclear facility, which required him to have a security clearance. The Defendant admitted using cocaine and methamphetamine once or twice a week between the ages of 21 to 28. He stated he had not used drugs for approximately three years before the homicide.

Victim impact statements were filed by 24 individuals, including numerous family members and friends of the victim. The statements asked that the Defendant be given the maximum sentence, and several individuals expressed disappointment in the jury verdict of reckless homicide in a situation where the Defendant came to the victim's home and shot him in the back. Laura Johnson, the victim's fiancée and the mother of the victim's daughter, provided a statement concerning how the homicide had impacted her both emotionally and financially. Ms. Johnson stated that she suffers from severe depression, severe anxiety, and post-traumatic stress disorder as a result of the victim's death.

Criminal Investigator Larry Davis, of the District Attorney General's Office for the 12th Judicial District, testified about the rising incidence of gun violence in Grundy County for 2008 through 2012. Mr. Davis had been a special agent with the TBI for 23 years and had a total of 32 years of law enforcement experience in Grundy County.

Larry Henry, the victim's father, testified that the victim was the youngest of his three children. Mr. Henry described the devastating impact on his family caused by his son's death. On cross-examination, Mr. Henry admitting hearing the testimony at the trial of various witnesses who testified about the violent acts committed by the victim.

Aaron Goldsmith, the Defendant's co-worker at Adman Electric, testified favorably about the Defendant's work history and performance. Mr. Goldsmith did not know the Defendant to be violent and was shocked to hear about the shooting. Mr. Goldsmith did not know the Defendant owned a pistol.

Kenny Smith, the training director for the Chattanooga Electrical Apprenticeship and Training Center, testified that the Defendant had successfully completed a five-year training program. Mr. Smith testified that a felony conviction, if not expunged, would limit the job sites at which the Defendant could work by 40% to 50%. He said he had never known the

Defendant to fail a drug test during training or on the job.

Winfred Gearrin, the assistant business manager and construction dispatcher for IBEW Local 175 in Chattanooga, testified that he had received no negative feedback about the Defendant's job performance and that the Defendant had "topped out as a journeyman wireman." He estimated 80% to 90% of the job sites would not be available to a person convicted of a felony within the last five to seven years.

Jordan Brewer, the Defendant's wife, testified that the couple had a five-year-old daughter and she was expecting a second child. Mrs. Brewer also had custody of her five-year-old nephew. The Defendant provided the family's sole source of income.

At the conclusion of the sentencing hearing, the trial court announced its findings. The court noted that the Defendant shot the victim three times after going to the victim's home to demand payment of a $25 debt. The court also noted the jury rejected self-defense and had been lenient in its verdict, stating:

> Frankly, in the Court's view of the facts, that was less than the Court would have found simply because there was no proof that the Court would accept that the victim was armed or really created any kind of life-threatening situation.

After considering the enhancement factors outlined in Tennessee Code Annotated section 40-35-114 and mitigation factors outlined in Tennessee Code Annotated section 40-35-113, the court found the Defendant to be a Range I standard offender and sentenced the Defendant to four years.

Turning to judicial diversion, the court acknowledged that the Defendant was a "qualified defendant" for judicial diversion under Tennessee Code Annotated section 40-35-313(a)(1)(B)(i). The court found the following factors favored judicial diversion: the Defendant's amenability to correction, the Defendant had only two minor traffic convictions, and the Defendant was in good physical health. The court found the following factors did not favor judicial diversion: the circumstances of the offense, the Defendant's history of illegal drug use, and the Defendant's social history of anger-control issues. The court found that granting judicial diversion would not serve as a deterrence or serve the interests of the public in a county where gun violence was a major problem and incidence of gun violence was increasing. In weighing the factors, the court placed significant weight on the circumstances of this particular reckless homicide, which the court characterized as "very damning." The court also placed significant weight on deterrence, stating:

If the others, in fact, saw that you could kill somebody with a weapon and possibly get judicial diversion, there'd be no deterrence at all, I guess, to using weapons.

The trial court applied the sentencing principles outlined in Tennessee Code Annotated section 40-35-103, and found pursuant to subsection 103(1)(B) that "confinement was necessary to avoid depreciating the seriousness of the offense" and "confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses." Secondarily, based on the Defendant's extensive history of illegal drug use, the trial court found pursuant to subsection 103(1)(A) that "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct." For the same reasons, the trial court denied split confinement and sentenced the Defendant to four years' incarceration.

## Analysis

*Alternative Sentence*

First, the Defendant claims that the trial court erred in ordering him to serve his four-year sentence. The 2005 amendments to the Tennessee Criminal Sentencing Reform Act of 1989 ("the Sentencing Act") "vested the trial court with broad discretionary authority in the imposition of sentences." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). When a defendant challenges the manner of service of a sentence, this Court reviews the trial court's decision under the abuse of discretion standard, accompanied by a presumption of reasonableness. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). As long as the trial court's sentence is consistent with the purposes and principles of sentencing, a denial of an alternative sentence should be upheld. Id.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2012); Bise, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." Bise, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2012), Sentencing Comm'n Cmts.

In the instant case, the trial court conducted a sentencing hearing in which numerous witnesses testified. The trial court reviewed the purposes of the Sentencing Act outlined in Tennessee Code Annotated section 40-35-102 and placed on the record the factors it considered and its reasons for imposing a sentence of incarceration. The trial court applied

the sentencing principles outlined in Tennessee Code Annotated section 40-35-103 and found pursuant to subsection 103(1)(B) that "confinement was necessary to avoid depreciating the seriousness of the offense" and "confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses." Secondarily, based on the Defendant's extensive history of illegal drug usage, the trial court found pursuant to subsection 103(1)(A) that "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct." For the same reasons, the trial court denied split confinement and sentenced the Defendant to four years' incarceration.

Testimony from the trial and sentencing hearing supports the trial court's findings. The victim was shot three times, and the jury rejected the Defendant's self-defense argument by returning a guilty verdict. Further, testimony from the sentencing hearing indicated that Grundy County was experiencing increased incidence of gun violence. Finally, the Defendant admitted in the presentence report that he had a history of regularly using cocaine and methamphetamine. On appeal, the Defendant has not proven that the trial court abused its discretion or overcome the presumption that the sentence was reasonable. Therefore, we affirm the trial court's denial of an alternative sentence.

*Judicial Diversion*

Second, the Defendant claims the trial court erred in denying judicial diversion. We disagree.

The trial court correctly found the Defendant to be a "qualified defendant" for judicial diversion pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i) (2014). However, being a qualified defendant does not presumptively entitle a defendant to judicial diversion, but simply allows the trial court to grant diversion in appropriate cases. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A qualified defendant bears the burden of proving that he or she is a suitable candidate for judicial diversion. State v. Faith Renea Irwin Gibson, No. E2007-01990-CCA-R3-CD, 2009 WL 1034770, at *4 (Tenn. Crim. App. Apr. 17, 2009) (citing State v. Curry, 988 S.W.2d 153, 157 (Tenn. 1999); State v. Baxter, 868 S.W.2d 679, 681 (Tenn. Crim. App. 1993)).

In denying the Defendant judicial diversion, the trial court considered and weighed each of the seven common law factors[2] outlined in State v. Parker, 932 S.W.2d 945, 958

---

[2]The seven common law factors are (a) the accused's amenability to correction; (b) the circumstances of the offense; (c) the accused's criminal record; (d) the accused's social history; (e) the accused's physical and mental health; (f) the deterrence value to the accused as well as others; and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, Inc., 990 S.W.2d at 229; Parker,

(Tenn. Crim. App. 1996), and <u>State v. Electroplating, Inc.</u>, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). When a trial court properly considers and weighs these common law factors and supports its decision on the record, as the trial court methodically did in this case, challenges to the trial court's denial of judicial diversion are reviewed under "an abuse of discretion standard accompanied by a presumption of reasonableness." <u>State v. King</u>, 432 S.W.3d 316, 327 (Tenn. 2014). Under this standard, if the record contains any substantial evidence to support the trial court's decision, this court will not interfere with that decision. <u>Id.</u>

It was not disputed that the Defendant went to where he knew the victim to be, concealed his pistol in his belt behind his back, got into a verbal dispute with the victim over payment of a $25 debt, and shot the victim two times in the leg and once in the back causing the victim's death. We conclude the circumstances of this reckless homicide alone, to which the trial court gave great weight, provides substantial evidence to support the trial court's denial of diversion.[3] Additionally, the trial court considered other factors, such as deterrence in a county with significant and rising incidences of gun violence and the Defendant's prior history of illegal drug use. These factors provide additional, substantial evidence supporting the denial of judicial diversion. Therefore, we conclude that the record contains substantial evidence to support the trial court's denial of judicial diversion, and the Defendant has failed to overcome the presumption of reasonableness. We affirm the trial court's denial of judicial diversion.

## **Conclusion**

For the aforesaid reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

932 S.W.2d at 958.

[3]As correctly argued by the Defendant, this Court has recently held that a trial court cannot deny judicial diversion to a defendant found guilty of reckless homicide based on the permanency of death. <u>State v. Teresa Turner</u>, No. M2013-00827-CCA-R3-CD, 2014 WL 310388, at *6 (Tenn. Crim. App. Jan. 29, 2014). However, trial courts can consider the circumstances surrounding the homicide as a factor in determining whether diversion should be granted. <u>See</u> <u>Electroplating, Inc.</u>, 990 S.W.2d at 229 (trial courts must consider the circumstances of the offense when deciding whether to grant judicial diversion).